UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GEORGE SANTIAGO,

                       Plaintiff,

         -against-

COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__  7/14/2014

**13-CV-03951 (LTS)(SN)**

<u>**REPORT AND
RECOMMENDATION**</u>

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE LAURA TAYLOR SWAIN:**

      Plaintiff George Santiago, appearing *pro se*, brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI") benefits. The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. I conclude that the Commissioner failed to resolve ambiguities in the record as to the source of medical opinion statements, as demonstrated by the Administrative Law Judge's ("ALJ") failure to address several doctors' findings. This leaves the Court unable to determine if the ALJ properly complied with the Social Security Administration's ("SSA") regulations for evaluating medical opinions. In addition, Santiago has submitted new evidence to the Court that warrants a remand for its consideration. Accordingly, I recommend that the Commissioner's motion be DENIED and the case be remanded to the Commissioner for further proceedings.

## PROCEDURAL BACKGROUND

On January 11, 2011, Santiago submitted an application for SSI benefits. On March 24, 2011, the SSA denied this application. On May 9, 2011, an attorney advisor reached a fully favorable decision on Santiago's behalf, concluding that while Santiago's impairments did not meet or medically equal any of the listings impairments in 20 C.F.R. Part 404, Subpt. P, App'x 1, there were no jobs in the national economy that Santiago could perform given the attorney advisor's residual functional capacity ("RFC") determination: light work[1] with (1) an inability to lift or carry more than 10 pounds; (2) occasional pushing and pulling; (3) simple unskilled, nonpublic work; (4) only occasional interaction with coworkers or supervisors; (5) an inability to travel unaccompanied more than occasionally; (6) limited ability to deal with normal changes in a work environment; (7) an inability to deal with money; (8) and an inability to perform jobs with significant quality, quantity, or time related standards.

On July 11, 2011, the Appeals Council, on its own motion, reviewed the attorney advisor's decision. Additional evidence was submitted to the Appeals Council, including "a prescription for physical therapy, a referral to a neurologist, prescription records, and an authorization for a TENS unit . . . ." (R. 74; 441-47.) The Appeals Council concluded that substantial evidence did not support the attorney advisor's RFC assessment or the determination that Santiago was disabled due to his physical or mental impairments. It found that the medical

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

records indicated only moderate restrictions in lifting and supported the conclusion that Santiago could perform a full-range of light work. It further found that the medical evidence of record supported at most moderate limitations due to Santiago's mental impairments. The Appeals Council remanded the case to an ALJ for further proceedings, including consideration of Santiago's RFC during the entire period and, if warranted, use of a vocational expert.

Santiago subsequently appeared with his representative before ALJ Patrick Kilgannon on April 10, 2012. The ALJ issued a decision on April 27, 2012, denying Santiago benefits. The Appeals Council denied Santiago's request for review of the ALJ's decision on April 19, 2013, thereby rendering the decision of the Commissioner final.

On June 6, 2013, Santiago filed this *pro se* action, and on June 28, 2013, the Honorable Laura Taylor Swain referred Santiago's case to my docket for a report and recommendation. Santiago subsequently submitted additional medical records to the Court, which were also provided to defendant. On February 13, 2014, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. On March 19, 2014, the Court issued an Order directing Santiago to file a response by April 2, 2014, otherwise the motion would be considered fully briefed. On March 31, 2014, the Court received an additional document from Santiago, indicating that he was currently unable to work, and accepted the document as Santiago's response. The motion is considered fully briefed.

3

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

**I.      Non-Medical Evidence**

Santiago was born in 1958 and was 52 years old on the date of his application for benefits. Santiago completed either the eighth or ninth grade, and at the time of his hearing, lived in an apartment with his sister. He last worked in 2005 or 2006.

In a disability report, dated December 17, 2010, and completed with the assistance of Bibiana Blanco, Santiago's case manager at FEGS, Santiago identified depression, post-traumatic stress disorder, uncontrolled hypertension, dislocated right shoulder, back pain, and hepatitis C as the conditions that limited his ability to work. Santiago noted that he had been depressed since childhood and experienced sudden mood swings every day. He avoided being in crowded places because he was easily agitated. Santiago had not received mental health treatment since 2009 because he lost his Medicaid insurance, but was in the process of receiving treatment at All Med Medical and Rehab at the time of the report.

On February 2, 2011, Blanco completed a third-party function report. Santiago reported that he could not sleep through the night due to severe right shoulder and back pain. He did not cook for himself but relied on his sister for food preparation. Santiago also did not perform other chores because of his shoulder and back pain. Santiago reported that he could go outside alone and relied on walking or public transportation. Santiago described himself as "very antisocial" but had no difficulties getting along with his family. (R. 176.) Blanco noted that Santiago was extremely moody during the interview.

Blanco indicated that Santiago's ability to lift, bend, stand, walk, and concentrate was affected by his impairments. According to Santiago, he could not lift anything over 10 pounds and found it difficult to bend over, stand for more than 25 minutes, and walk long distances.

## II.   Medical Evidence

### A.   Before January 11, 2011[2]

#### 1.   Lincoln Medical and Mental Health Center ("Lincoln Medical")

Santiago was treated at Lincoln Medical between June 2006 and September 2010 on numerous occasions for a variety of ailments including right shoulder pain, back pain, hypertension, cellulitis, swelling and an abscess of the leg, itchy red eyes, wrist pain, an insect bite, and a human bite. Most of the medical records are from visits to the facility in 2008. While some of the records note that Santiago could move all of his extremities, his range of motion was limited in his right shoulder as a result of pain. In September 2008, Santiago described his back pain as three out of ten, his leg pain as between one to five out of ten, and his shoulder pain as three out of ten. Santiago's gait, however, was observed to be normal. He was prescribed various medication for his right shoulder pain, hypertension, and leg cellulitis and was also referred to physical therapy for his leg and shoulder. The Lincoln Medical records generally indicate that Santiago was independent in his activities of daily living and was oriented to person, place and time.

While back pain and depression are noted in the medical records from Lincoln Medical, the evidence primarily addresses Santiago's shoulder pain. In 2006, Dr. Carella, upon examination of Santiago and review of an x-ray of his shoulder, determined that there was no

---

[2] This is the date of Santiago's application for benefits. The earliest month for which the SSA can pay benefits is the month after the month the claimant filed his application. 20 C.F.R. § 416.335.

fracture and no dislocation, but there was a 2-3 grade separation of the AC joint. Dr. Carella noted "minimal clinical objective findings." (R. 295.) In July 2007, although Santiago had a limited range of motion in his right shoulder due to pain, Dr. Stoimen Evtimov at Lincoln Medical reported that Santiago's right shoulder pain was not disabling and did not qualify as a disability. In October 2007, Dr. Mistry Rakeshkumar noted a limited range of motion in Santiago's right shoulder, and Santiago reported that the pain was not controlled by medication. Santiago also reported that his shoulder pain was a 6 out of 10 and that the pain interfered with his physical activity. In November 2007, Dr. Joji Sakuma, diagnosed Santiago with tendonitis.

In July 2008, Dr. Richard Frenkel completed a psychiatric summary. Santiago had a history of anxiety, depression, and difficulty sleeping. Dr. Frenkel noted that Santiago stopped using heroin in 1995 and was on methadone at the time of the summary. Dr. Frenkel diagnosed Santiago with major depressive disorder and indicated a Global Assessment of Functioning ("GAF") of 50.[3] At the time of the psychiatric summary, Santiago was living in a shelter. Dr. Frenkel noted that Santiago needed to have stable housing to minimize his stress level, engage in weekly individual psychotherapy, and take his medications as prescribed.

---

[3] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed. rev. 2000)). A GAF score from 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). A GAF score of 41-50 represents serious symptoms or any serious impairment in social or occupational functioning. The Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). The DSM IV, however, was in effect at the time of Santiago's treatment.

## 2. Federation of Employment and Guidance Service ("FEGS")

On December 17, 2010, Abraham Burstein, a social worker with FEGS, completed a biopsychosocial summary for Santiago. At the time, Santiago was renting a room from his sister. Santiago denied any paid work history. He reported that he began using heroin at 22 but entered treatment at West Midtown Medical in 1995, and had not used heroin since. He was prescribed 120 milligrams of methadone daily.

Santiago informed the social worker that he had a history of depression, suicidal ideation, and suicide attempts, though he denied any current plans or intent to commit suicide. His last suicide attempt was at the age of 30. Santiago reported that he began hearing voices calling his name and mumbling around the age of 20 and last heard these voices in 2007. Santiago, however, was not taking any medication at the time of the evaluation. Santiago indicated that he felt depressed and hopeless nearly every day and had difficulty falling or staying asleep. He also had difficulty concentrating. Santiago stated that his problems made working, domestic chores, and interacting with people extremely difficult. Santiago reported that he was able to complete all of his activities of daily living, albeit slowly and over a long period of time due to his leg and back pain, but was unable to work. The social worker indicated that Santiago had severe depression. He also noted that Santiago had used public transportation to arrive at the appointment and had no travel limitations.

Dr. Sandhya Pattem, a physician at Bronx Lebanon Hospital, performed an examination on December 17, 2010, and indicated that Santiago reported back pain and depression as the current medical conditions related to his employment difficulties. Dr. Pattem noted abnormalities in Santiago's spine, right upper extremity, and right lower extremity, and observed right para-spinal muscle tightness and mild limited abduction.

7

With regard to his mental state, Dr. Pattem observed that Santiago was not alert but was oriented. His mood was abnormal and he had a mildly flat affect. Dr. Pattem noted that he had not been taking his medications.

On January 4, 2011, Dr. Hayden performed a psychiatric consultation.[4] Dr. Hayden indicated that Santiago was unkempt but calm and cooperative. His affect was constricted and his mood was depressed. He reported auditory hallucinations and suicidal ideations. Dr. Hayden described Santiago's ability to follow work rules, deal with the public, and adapt to change and stressful situations as severely impaired. His ability to maintain attention and relate to co-workers was moderately impaired. Dr. Hayden diagnosed Santiago with major depressive disorder and post-traumatic stress disorder, and also noted that he had arthritis and back, leg, and foot pain. Dr. Hayden indicated that Santiago's GAF was 45. Although Santiago had no travel restrictions, he had "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work" based on his depression and post-traumatic stress disorder. (R. 336.)

On January 4, 2011, Dr. Pattem diagnosed Santiago with hypertension, depression, right shoulder pain, back pain, and a history of hepatitis C. She indicated that he had no travel limitations. Dr. Pattem wrote "not applicable" for Santiago's work limitations criteria. (R. 314.) On that same date, Dr. Pattem indicated that Santiago had "substantial functional limitations to

---

[4] There is some confusion in the record as to the source of the notes for the FEGS BPS Phase II Psychiatric Consultation. The Commissioner identifies the source as Bertha Alvarez, a social worker with FEGS. Notations made by Dr. Pattem, however, suggest that Dr. Hayden completed, or at least affirmed, the determination that Santiago could not work due to depression and post-traumatic stress disorder. (See R. 316) ("[P]hase II psych consult by Dr. Hayden reviewed and appreciated. [R]ecommends SSI for chronic Depression and PTSD."). Furthermore, there is a note in the FEGS record that "FHayden" completed a "BPS II Exam" on January 4, 2011. (R. 338.)

employment due to medical conditions that will last for at least 12 months and make the individual unable to work."[5] (R. 316-17.) Dr. Pattem referred Santiago for a psychiatric evaluation.

On January 6, 2011, Johanna Arias, an SSI Entitlement Specialist at FEGS, indicated that Santiago was referred to the SSI track due to his uncontrolled hypertension, depression, and post-traumatic stress disorder. Arias also noted that Santiago had "medical and/or mental health conditions that significantly affect[ed] functioning. The client has other conditions that consist of: Shoulder, Back, and Leg Pain." (R. 327.)

The ALJ did not address any of these FEGS records in his decision.

**B.   After January 11, 2011**

### 1. All Med and Rehabilitation of New York ("All Med")

Santiago was seen for medical treatment at All Med beginning January 2011. Dr. Monica Martin examined Santiago on four occasions for his physical ailments. Most of her notes are illegible. On January 26, 2011, Dr. Martin noted that Santiago and been referred to All Med by FEGS. His blood pressure was 130/84, and she noted a dislocated right shoulder. On February 24, 2011, Santiago's blood pressure was 160/100. Dr. Martin noted Santiago's hypertension and referred him to a cardiologist. On March 12, 2011, Santiago's blood pressure was 130/70. Dr. Martin made a notation of a dislocated [right] shoulder and hypertension. She appears to have referred him to orthopedics. On April 29, 2011, Dr. Martin saw Santiago for medication refills, and his blood pressure was 120/70.

In July and August 2011, Dr. Kenneth McCulloch referred Santiago for physical therapy for "chronic LS sprain/strain" and "LS disk herniation." (R. 441.) The goal of the therapy was to

---

[5] Dr. Pattem's finding that Santiago was unable to work may prove to be a reiteration of Dr. Hayden's finding as to functional work limitations in the Phase II Psychiatric Consultation report.

increase Santiago's range of motion, decrease pain or swelling, and improve function. The physical therapy prescription indicated that Santiago was to attend three times per week for four weeks. The treatment was to include moist heat, cold pack, ultrasound, massage, and therapeutic exercises for range of motion and muscle strengthening. In July 2011, Santiago was informed that his health care provider had authorized the purchase of a support for his back.

From March 2011 to May 2011, Dr. Fruitman, a psychiatrist at All Med, examined Santiago on three occasions. Most of his notes are illegible. On March 2, 2011, Santiago reported insomnia and anxiety. On April 1, 2011, Santiago again reported anxiety, and Dr. Fruitman continued to prescribe medication for his depression, anxiety, and insomnia. On May 2, 2011, Dr. Fruitman examined Santiago for medication management. Santiago claimed that his medications were not working for him. Dr. Fruitman noted that Santiago's hygiene was good and his mood was calm. He was coherent, made good eye contact, denied any suicidal or homicidal ideation. Santiago demonstrated no acute psychotic symptoms and was coherent. Dr. Fruitman recommended that he remain on his prescription medication.

### 2. Commissioner's Examinations

#### a. Dr. Herb Meadow

On March 10, 2011, Dr. Herb Meadow, a psychiatrist, evaluated Santiago at the Commissioner's request. Santiago arrived at his appointment by public transportation. Santiago informed Dr. Meadow that he socialized primarily with his immediate family and spent his time watching television and listening to music. He took care of his own hygiene but did not perform any household chores.

Santiago reported that he had no history of psychiatric hospitalizations but had been receiving psychiatric treatment at All Med for the past two months. Santiago had difficulty

falling asleep and was depressed with dysphoric moods, irritability, low energy, diminished self-esteem, and difficulty concentrating. He had suicidal thoughts in the past but told Dr. Meadow that he was not currently having them, though he did have flashbacks and nightmares of being sexually abused as a child. While Santiago stated that he had panic attacks, Dr. Meadow noted that he was actually describing psychomotor agitation, which was his only manic symptom. Santiago reported that he was taking prescription medications for his depression, insomnia, and hypertension.

Dr. Meadow observed that Santiago's demeanor was cooperative, and he related adequately. He was appropriately and neatly dressed. His gait, posture, and motor behavior were all normal. His eye contact was appropriate and his speech was fluent and clear. He was coherent and goal-directed, with no indications of hallucinations, delusions, or paranoia. His affect was appropriate, and he was oriented to time, place, and person. His recent and remote memory skills were intact.

Santiago's mood, however, was depressed, and his attention and concentration were impaired due to his limited intellect. Santiago could count but he could not add or subtract single-digit numbers. Dr. Meadow described Santiago's cognitive functioning as below average. Santiago's insight and judgment were fair.

Dr. Meadow diagnosed Santiago with depressive disorder, post-traumatic stress disorder, cognitive disorder, heroin abuse/dependence in remission, and opioid dependence. He also diagnosed right shoulder pain, back pain, and hypertension. Dr. Meadow indicated that Santiago's prognosis was fair and recommended continued psychiatric treatment. Dr. Meadow reported that Santiago would be able to perform all the tasks necessary for vocational functioning. Though the results of the exam were consistent with psychiatric and cognitive

11

problems, these problems did not appear to be significant enough to interfere with Santiago's ability to perform the daily tasks of living. Santiago, however, would need assistance in managing his funds because he had difficulty with math.

### b. Dr. William Lathan

On March 10, 2011, Dr. William Lathan performed a medical examination at the request of the Commissioner. Upon physical examination, Santiago appeared to be in no acute distress. His gait was normal, and he could walk on his heels and toes without any difficulty. Santiago could perform a full squat and his stance was normal. He used no assistive devices during the examination and needed no help changing for the exam or getting on and off the exam table. Santiago was able to rise from his chair without difficulty.

Santiago's cervical spine and lumbar spine showed full flexion, extension, lateral flexion, and full rotary movements bilaterally. There was no evidence of scoliosis or abnormality in the thoracic spine. There was a full range of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. Santiago's joints were stable and not tender, with no redness, heat, swelling, or effusion. He also had full strength in his upper and lower extremities. His hand and finger dexterity were intact, and he possessed full grip strength bilaterally.

Dr. Lathan noted a history of right shoulder arthralgia, back syndrome, hypertension, and depression. Santiago's prognosis was reported to be stable. Dr. Lathan indicated a moderate restriction for lifting, pushing, pulling, and reaching with the upper right extremity and for bending and strenuous exertion. Dr. Lathan also recommended a psychiatric consultation.

On March 10, 2011, Dr. Lawrence S. Liebman, a radiologist, reviewed x-rays of Santiago's back and shoulder taken in conjunction with his consultative examination. Dr. Liebman noted that there was degenerative spondylosis at L1-L2 in Santiago's spine. There was

no evidence of a compression fracture, but there was a transitional L5 vertebral body. Dr. Liebman noted that these were degenerative changes. Upon examination of the right-shoulder x-ray, Dr. Liebman found no evidence of acute fracture, dislocation, or destructive bony lesion. The joint spaces were relatively well maintained, and there were post-surgical changes of the lateral end of the clavicle.

### c.   Dr. A. Burford

On March 21, 2011, Dr. A. Burford evaluated the evidence of record and completed a Physical Residual Functional Capacity Assessment for Santiago. Dr. Burford described Santiago's primary diagnosis as shoulder disorder and high blood pressure, with a secondary diagnosis of degenerative disease of the spine. Dr. Burford indicated that Santiago could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds. Santiago could stand, walk, or sit with normal breaks for about 6 hours in an 8-hour workday. Santiago had no restrictions for pushing or pulling, other than those for lifting and carrying. Dr. Burford indicated that Santiago had no postural, manipulative, visual, or environmental limitations.

Dr. Burford noted that Santiago claimed chronic back and shoulder pain and that he used over-the-counter pain medication. Dr. Burford reported that Santiago had a full range of motion in his shoulder and back with normal strength. The x-ray of Santiago's back showed some degenerative changes, but the x-ray of his right shoulder was within normal limits except for post-surgical changes to the clavical. Based on the objective medical evidence, Dr. Burford found Santiago's allegations only partially credible. Dr. Burford concluded that the "severity of his impairments does not preclude his ability to perform light work." (R. 403.)

#### d.  Dr. T. Harding

On March 22, 2011, Dr. T. Harding, a state agency psychologist, evaluated the evidence of record. Dr. Harding noted a diagnosis of a cognitive disorder, depression, post-traumatic stress disorder, and opioid dependence. Dr. Harding indicated that Santiago demonstrated moderate limitations in his daily living activities, social functioning, and concentration, persistence, or pace, and had no episodes of deterioration for an extended period. Dr. Harding further indicated that the evidence did not establish the presence of a paragraph C criteria.

After assessing Santiago's mental residual functional capacity, Dr. Harding concluded that Santiago had, at most, moderate limitations. The following abilities were moderately limited: (1) to understand, remember, and carry out detailed instructions; (2) to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) to accept instructions and respond appropriately to criticism from supervisors; and (4) to respond appropriately to changes in the work setting. Dr. Harding indicated that all other abilities were not significantly limited. Dr. Harding concluded that Santiago may have some difficulty completing complex tasks and responding appropriately to stress, but the evidence of record did not support a finding of marked limitations. Santiago retained the ability to perform unskilled work.

### C. Medical Evidence Submitted to the Court

#### 1. Documents Attached to the Complaint

Santiago attached several medical records to his complaint, filed on June 6, 2013, which are not found in the administrative record. These documents include underlying treatment notes from a nurse practitioner at All Med, dated January 7, 2013, March 4, 2013, and April 3, 2013.

14

The notes from January 2013 indicate that Santiago continued to complain of insomnia. He was diagnosed with bipolar disorder and instructed to continue with his medication. His mood was euthymic. The notes further indicate that he was "unemployed" and "disabled." (Compl. at 8.) The March 2013 report notes that Santiago visited the office for his anxiety and depression. His employment status was listed again as "unemployed" and "disabled." (Compl. at 12.) No further notations regarding Santiago's mental impairments were provided.

Santiago also attached treatment notes from various physician's assistants and nurse practitioners, all supervised by Henry Sardar, DO, dated January 30, 2013, March 13, 2013, April 9, 2013, and May 22, 2013. Hoda Abdelaziz, a family nurse practitioner, treated Santiago for back and shoulder pain. On January 30, 2013, Santiago complained of bilateral shoulder pain and chronic low back pain, both of which had been ongoing for years. Santiago reported that the pain was a 9 out of 10. Santiago was taking several prescription medications, using a gel, and receiving physical therapy to address the pain. Abdelaziz indicated that Santiago's mood was normal, his affect was bright, with no signs of depression or anxiety. She described his gait as slow, with difficulties in standing and walking without an assistive device. Santiago's standing balance was fair and his sitting balance was good.

Abdelaziz observed a decreased range of motion in forward flexion and abduction in Santiago's shoulders, and signs of impingement. There was tenderness in both shoulders as well as diminished sensation over the C6-C7 dermatome. The examination revealed that Santiago's lumbar spine had a positive decrease range of motion in all planes, with pain at the end of the range. Abdelaziz observed significant spasm, taut muscle bands, and tenderness to palpation over the lumbar paraspinal region. Abdelaziz noted muscle pain and spasm, lumbar and cervical radiculopathy, shoulder and low back pain, gait dysfunction with difficulty ambulating, and

bilateral shoulder impingement syndrome. She also noted diminished sensation on the L4-L5 and L5-S1 dermatomal distribution bi-laterally. Abdelaziz recommended that Santiago continue with his current prescriptions and physical therapy. She also performed a right sacroiliac joint injection. In March 2013, Santiago was again examined by Abdelaziz, and the treatment record is nearly identical to the January 2013 report.

In April 2013, Tae Soo Kim, a physician's assistant supervised by Dr. Sardar, treated Santiago. Santiago complained of bilateral shoulder pain and chronic low back pain, which he reported to be a 7 out of 10 on average. Santiago also reported that the pain had significantly worsened over the last few days. The medications and cream used by Santiago had provided satisfactory pain control as well as improvement in functional activity, and the right sacroiliac joint injection had "markedly" helped with the pain and functionality for a prolonged period of time. (Compl. at 16.) The rest of the report is nearly identical to prior reports, except for the fact that Santiago refused another injection.

In May 2013, Dr. Sardar examined Santiago. Much of the information in the treatment records is identical to that in the April 2013 report. Santiago reported that his pain was an 8 out of 10 on average. Dr. Sardar described Santiago's impairments as "severe." (Compl. at 18.) Dr. Sardar prescribed medication and performed a trigger point injection in the lumbar region of Santiago's back.

### 2. Documents Submitted on July 31, 2013

On July 31, 2013, Santiago submitted additional documents to the Court. Some of these documents are duplicative of evidence in the medical record, and some of the documents are medical records which predate or postdate the period at issue here. These records include

prescription lists, psychiatric assessments, a list of physical therapy treatments provided, and physician treating plan reports.

### a. Documents Predating Relevant Period

Dr. Richard Fenkel completed a psychiatric assessment of Santiago on October 22, 2007. Santiago was oriented and his concentration and memory were fair. Santiago was cooperative, though he was anxious, depressed, and not sleeping well. Dr. Fenkel diagnosed Santiago with major depression and prescribed medications.

### b. Documents Postdating the Relevant Period

In October 2012, Daniel Paniagua, a physician's assistant at West Midtown Medical Group, examined Santiago. He noted a history of chronic bilateral shoulder pain that increased with activity and walking. Paniagua observed Santiago's gait to be normal and he was oriented to person, place, and time. He had a decreased range of motion in his shoulders and tender biceptal tendons. Paniagua also noted a decreased range of motion in Santiago's back due to pain. Santiago also reported that his hypertension was controlled by diet and denied taking medications for the hypertension. Paniagua noted that Santiago had a history of post-traumatic stress disorder and depression.

In September 2013, Juliana F. Bizerril-Williams, a licensed physician's assistant supervised by Dr. Sardar, completed a Treating Physician's Wellness Plan Report at the prompting of FEGS. Bizerril-Williams indicated that Santiago was unable to work for at least 12 months due to joint pain. On September 10, 2013, Santiago presented with neck pain, shoulder pain, and low back pain. Santiago requested that his treatment be focused on his lower back pain, which he described as a 9 out of 10. The pain interfered with his activities of daily living and standing or sitting for a prolonged time. At the time of the exam, Santiago was taking various

prescription medications for the pain and using a cream, which provided moderate control of his pain as well as improvement in his functional activity. Bizerril-Williams indicated that Santiago's mood was normal, his affect was bright, with no signs of depression or anxiety. She described his gait as slow, with difficulties in standing and walking without an assistive device. Santiago's standing balance was fair and his sitting balance was good. The examination revealed that Santiago's lumbar spine had a positive decrease range of motion in all planes, with pain at the end of the range. Bizerril-Williams observed significant spasm, taut muscle bands, and tenderness to palpation over the lumbar paraspinal region. Bizerril noted muscle pain and spasm, lumbar and cervical radiculopathy, shoulder and low back pain, gait dysfunction, with difficulty walking, and bilateral shoulder impingement syndrome. Bizerril-Williams recommended that Santiago continue with his current prescriptions, and he received a right sacroiliac joint injection.

In July 2013, a nurse practitioner at All Med noted that Santiago had arrived at the facility using a rolling walker.

### 3. Document Submitted As Opposition

On March 31, 2014, the Court received an additional document from Santiago and interpreted it to be Santiago's response to the Commissioner's motion. The document was a notification of temporary assistance work requirements determination for the City of New York, indicating that as of February 15, 2014, Santiago had been determined to be exempt from participating in the temporary assistance work activities because he was unable to work due to a medical issue. No further details on the nature of the medical issue were provided.

**II.     The Administrative Hearing**

**A.  Santiago's Testimony**

Santiago appeared at the hearing on April 10, 2012, with a representative. Santiago testified that he was 53 years old at the time of the hearing. He testified that he completed the eighth grade in New York, and had no other job training or education. Santiago relied primarily on the subway for transportation and lived with his sister. Santiago last worked for a temporary job placement agency, Top Job Personnel, in approximately 2005. He worked on a day-to-day basis as a "truck helper" making deliveries to companies. (R. 36-37.)

Santiago testified that his back and right shoulder were the main problems affecting his ability to work. He testified he had not had surgery, physical therapy, or injections for his shoulder but he did take medication. Santiago relied on medication and shock therapy for his back, but the therapy was not very helpful in reducing the pain. Santiago informed the ALJ that he had an MRI on his back, which apparently showed a strain of the spine. Santiago indicated that he also had a pulled leg muscle that began about the same time as his back problems.

Santiago testified that he was also receiving mental health treatment from Dr. Fruitman at All Med for depression. He attended monthly appointments to receive his medication. Santiago stated that his medication helped a little with the depression and that he had never been hospitalized for any mental health condition.

The ALJ asked Santiago to describe a typical day. Santiago informed the ALJ that early in the morning he would go to his methadone program. At the appointments, he would talk with his counselor and receive his medication. Then he would go home and watch television. Santiago testified that he was able to bathe and dress himself, but his sister would do the cooking. He went

to church once in a while, but he did not have many friends. He did, however, enjoy spending time with his family.

### B.  Vocational Expert Testimony

Christina Boardman, a vocational expert, testified at the hearing by telephone. She reviewed the evidence in the record and testified that Santiago had prior work experience as a truck helper. The ALJ asked the vocational expert to assume an individual of Santiago's age, educational background, and work experience who could perform only light exertional work with the following limitations: (1) lift up to 20 pounds occasionally; (2) lift or carry up to 10 pounds frequently; (3) stand, walk, or sit for approximately six hours per eight-hour workday, with normal breaks; (4) pushing or pulling, including the operation of hand or foot controls frequently with the upper right extremity; (5) climb ramps and stairs frequently; (6) no climbing of ladders, ropes, or scaffolds; (7) balance, stoop, kneel, crouch, or crawl occasionally; (8) reaching, including overhead reaching, only frequently in right dominant upper extremity; (9) simple, routine, and repetitive tasks; and (10) a low stress job with only occasional decision-making and occasional changes in work setting. The vocational expert testified that Santiago would not be able to perform his prior work as a truck helper with such restrictions. He would, however, be able to perform other jobs such as mail clerk, marker, and usher. Each of these jobs were available in significant numbers: (1) mail clerk, 7,580 regionally and 119,960 nationally; (2) marker, 63,730 regionally and 1,795,970 nationally; and (3) usher, 6,670 regionally and 107,200 nationally.

The ALJ noted that if it was found that Santiago could perform only sedentary work, a Grid rule[6] would apply and Santiago would be entitled to benefits. The ALJ asked the vocational expert about the impact of absences on Santiago's ability to work. The expert confirmed that if Santiago were absent in excess of one time per month, he would not be able to maintain his employment at any of these jobs.

On April 27, 2012, the ALJ issued his decision denying Santiago's claim for SSI, and on April 19, 2013, the Appeals Council denied Santiago's request for review, thereby rendering the decision of the Commissioner final.

## DISCUSSION

### I.     Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind

---

[6] "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable [M]edical [V]ocational guidelines." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (citation and internal quotation marks omitted). Those guidelines, colloquially known as "the Grids," take into account "the claimant's residual functional capacity in conjunction with the claimant's age, education, and skill level." Id. (citation and internal quotation marks omitted).

might accept as adequate to support a conclusion.'" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. <u>Diaz v. Shalala</u>, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. <u>See</u> <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and internal quotation marks omitted; emphasis in original)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); <u>see</u> <u>Alvarez v. Barnhart</u>, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

## II.   Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education and past relevant work experience. 20 C.F.R. § 416.960(c)(2); Melville, 198 F.3d at 51.

23

Title 20 C.F.R. § 416.920a provides additional information to guide evaluations of mental impairments. Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 416.920a(c)(1),(2). The main areas that are assessed are activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation; each is rated on a five-point scale.  20 C.F.R. § 416.920a(c)(3)-(4). If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder.  20 C.F.R. § 416.920a(d)(2).

An affective disorder, such as depression, will qualify as a "listed impairment" if there is medically documented persistence, either continuous or intermittent, of depressive syndrome resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. [7]  20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B) (so called "paragraph B criteria"). If the mental disorder does not qualify as a listed impairment under these standards, it will still qualify as a disability if there is:

> a medically documented history of a chronic affective disorder of at least 2 years'
> duration that has caused more than a minimal limitation of ability to do basic

---

[7] "The term repeated episodes of decompensation, each of extended duration in the[] listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." If the claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.00(C)(4).

work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended duration; or a [r]esidual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(C) (so called "paragraph C criteria").

## III.    The ALJ's Determination

On direction from the Appeals Council, the ALJ considered Santiago's maximum RFC based on additional evidence, including medical source statements and the testimony of a vocational expert. On April 27, 2012, after evaluating Santiago's claims pursuant to the sequential evaluation process, the ALJ issued a decision finding that Santiago was not disabled within the meaning of the Social Security Act from the date his application was filed, January 11, 2011. At step one, the ALJ determined that Santiago had not been engaged in "substantial gainful activity" ("SGA"). At step two, the ALJ found that Santiago had the following severe impairments: lumbar disc disease, right shoulder impairment, and depression. The ALJ concluded that Santiago also had the following non-severe impairments, which had only a *de minimus* effect on his ability to work: hypertension, high cholesterol, and Hepatitis C. At step three, the ALJ found that Santiago's severe impairments, however, did not meet or medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ relied on Santiago's testimony and Dr. Meadow's opinion when articulating the reasons for his determination at Step Three.

The ALJ determined that Santiago had the residual functional capacity to perform light work except that he could not climb ladders, ropes, or scaffolds, though he could frequently

climb ramps or stairs. Santiago could occasionally balance, stoop, crouch, or crawl. He could

frequently reach in all directions and push or pull with his dominant right upper extremity.

Santiago's non-exertional limitations[8] resulting from his depression restricted him to routine,

repetitive, and simple tasks in a low-stress environment that required only occasional decision-

making and occasional changes in the work setting. The ALJ based his determination on "the

opinion[s] of Dr[s]. Lathan, Meadow, and Harding," and Santiago's "subjective allegations and

the effects of his obesity on his ability to carry out physical and work activities."

　　　At step four, the ALJ found that Santiago was unable to perform any of his past relevant

work. Finally, at step five, the ALJ determined that Santiago had the capacity to perform other

types of jobs that existed in significant numbers in the national economy.[9] Therefore, Santiago

was not disabled.

---

[8] A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use of the fingers for fine activities." Archambault v. Astrue, 09 Civ. 06363 (RJS)(MHD), 2010 WL 5829378, at *35 (S.D.N.Y. Dec. 13, 2010) (citation omitted), rep. and rec. adopted by 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011) (citation and quotation marks omitted; alteration in original).

[9] The ALJ considered Santiago's age when determining the availability of jobs. (R. 23.) In his written decision, the ALJ identified Santiago as a "younger individual age 18-49," though he recognized Santiago's age to be 52. According to the Social Security Act, an individual age 52 is considered to be an individual "closely approaching advanced age." 20 C.F.R. § 416.963 ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45. . . . If you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.") While the ALJ did not rely solely on the Grids for his determination of available work, the correct age category should be applied on remand.

IV.     **Legal Errors**

    A.  **Legal Standard**

        1.   **Duty to Develop the Record**

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a twelve-month period. 42 U.S.C. § 423(d)(5)(B), 20 C.F.R. § 416.912(d). Further, the Act authorizes the Commissioner to "issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation . . . ." 42 U.S.C. § 405(d).

   The Court of Appeals considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record. Indeed, before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full hearing. Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (holding that an ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act" (citing Gold v. Sec'y of HEW, 463 F.2d 38, 43 (2d Cir. 1972))). Due to the "non-adversarial nature" of social security proceedings, a full hearing requires the ALJ to "affirmatively develop the record." Echevarria, 685 F.2d at 755. Whether or not the claimant is represented by counsel, Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999), the ALJ must contact medical sources and gather any additional information if the ALJ believes that the record is inadequate to make a determination. When the ALJ has failed to develop the record adequately, the district court must remand to the Commissioner for further development. See, e.g., Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

   The ALJ's duty to develop the record is further enhanced when the disability in question is a psychiatric impairment. The Regulations articulate that claims concerning mental disorders

27

require a robust examination that is sensitive to the dynamism of mental illnesses and the coping

mechanisms that claimants develop to manage them:

> Particular problems are often involved in evaluating mental impairments
> in individuals who have long histories of repeated hospitalizations or
> prolonged outpatient care with supportive therapy and medication. For
> instance, if you have chronic organic, psychotic, and affective disorders,
> you may commonly have your life structured in such a way as to minimize
> your stress and reduce your symptoms and signs. In such a case, you may
> be much more impaired for work than your symptoms and signs would
> indicate. The results of a single examination may not adequately describe
> your sustained ability to function.  It is, therefore, vital that we review all
> pertinent information relative to your condition, especially at times of
> increased stress.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).  Similarly, Social Security Ruling 85-15 directs

the Commissioner to consider that "[d]etermining whether these individuals will be able to adapt

to the demands or 'stress' of the workplace is often extremely difficult."  SSR 85-15 at *5. The

Ruling explains that this difficulty arises because individuals with mental illnesses "adopt a

highly restricted and/or inflexible lifestyle within which they appear to function well."  Id. at 6.

The Rulings point out that, when claimants are in structured settings, they are able to function

adequately "by lowering psychological pressures, by medication, and by support from services . .

. ." Id.

Proper application of the rule ensures that the claimant's record is comprehensive,

including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain

clearly how these opinions relate to the final determination. In this circuit, the rule is robust. See,

e.g., Schaal v. Apfel, 134 F.3d 496, 503-05 (2d Cir. 1998) (remanding a case to the SSA for

further development "because we are unsure exactly what legal standard the ALJ applied in

weighing [the treating physician's] opinion, because application of the correct standard does not

lead inexorably to a single conclusion, and because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion as required by SSA regulations").

### 2. Treating Physician Rule

The "treating physician rule" is inextricably linked to the duty to develop the record. Under the treating physician rule, the ALJ is required to give the medical opinion of a treating physician "controlling weight" on whether or not claimant's impairments prevented her from being able to engage in substantial gainful activity if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted) (alteration in original). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). See also Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 327 (S.D.N.Y. 2010) (finding the ALJ validly rejected the treating physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record; thus, remand for reapplication of the treating physician rule was not appropriate). A report by a consultative physician may constitute substantial evidence when the treating physician's opinion is inconsistent with other substantial evidence in the record. Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. Feb. 4, 2011).

If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure, considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment

29

relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 416.927(c)(2)-(6). This process must also be transparent: the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision. Snell, 177 F.3d at 134.

### 3.  Medical Source Opinions

Consideration of the duty to develop the record, together with the treating physician rule, produces an obligation that encompasses the duty to obtain information from physicians who can provide opinions about the claimant. The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced. This is, in part, because the ALJ is required to "probe into, inquire of, and explore for *all* the relevant facts," Cruz, 912 F.2d at 11 (emphasis supplied), and "review *all* pertinent information relative to [the claimant's] condition." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E) (emphasis supplied). See also 12 C.F.R. § 416.913(b)(6) (explaining that "the Commissioner "will request a medical source statement about what [the claimant] can still do despite [his] impairment(s) . . .". See Jones v. Apfel, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999) (noting the regulations require the Commissioner to make "every reasonable effort" to get the necessary medical reports and remanding for failure to do so); Cruz, 912 F.2d at 11.

While 12 C.F.R. § 416.913(b)(6) seems "to impose on the ALJ a duty to solicit such medical opinions," the regulations also indicate that "the lack of the medical statement will not

make the report incomplete." Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33 (2d Cir. Apr. 2, 2013). Accordingly, the Court of Appeals has held that "it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity," in cases where there is a "voluminous medical record" that permits the ALJ to make a determination as to disability. Tankisi, 521 F. App'x at 34.

### 4. Additional Evidence

Under 42 U.S.C. § 405(g), the Court may remand a case to the Commissioner for the consideration of new evidence if the new evidence is "material" to the disability determination and where "good cause for the failure to incorporate such evidence into the record in a prior proceeding" is shown. 42 U.S.C. § 405(g). The Court of Appeals has held that three requirements must be satisfied to remand on this ground: (1) the evidence must be new and not merely cumulative of evidence already in the record; (2) the evidence must be material, meaning relevant to the time period of denial, probative, and reasonably likely to have influenced the Commissioner to reach a different conclusion; and (3) there must be good cause for the failure to present the evidence earlier. Mulrain v. Comm'r of Soc. Sec., 431 F. App'x 38, 38 (2d Cir. 2011) (citing Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)). "[M]edical evidence generated after an ALJ's decision [cannot] be deemed irrelevant solely because of timing . . . ." Williams v. Comm'r, 236 F. App'x 641, 644 (2d Cir. 2007) (citing Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004)). Such evidence may be relevant if it "disclose[s] the severity and continuity of impairments existing [during the relevant period] or may identify additional impairments which could reasonably be presumed to have been present . . . ." Pollard, 377 F. 3d at 194 (quoting Lisa v. Sec'y of Dep't of Health and Human Servs., 940 F.2d 40, 44 (2d Cir. 1991) (quotation marks omitted)).

31

**B.  Application**

**1.  The FEGS Records and Medical Opinion Evidence**

In his written decision, the ALJ makes no reference to any of the medical records from FEGS, to Dr. Pattem, or to Dr. Hayden. The ALJ erred by, without explanation, failing to mention these treatment records and opinions, which included an assessment that Santiago was unable to work for at least 12 months and provided a diagnosis of hypertension, depression, post-traumatic stress disorder, right shoulder pain, back pain, and hepatitis C. Without any evaluation of this evidence, the ALJ concluded that Santiago's hypertension and hepatitis C were not severe impairments. This is particularly troubling given that the FEGS records indicate that Santiago's hypertension was one of his disabling impairments.

As noted previously, there is an ambiguity in the record as to who conducted the FEGS Phase II psychiatric assessment, an ambiguity that the ALJ was obligated to resolve in order to determine the weight to afford the assessment. It appears to the Court that two physicians, Dr. Pattem and Dr. Hayden, not social workers, opined that Santiago's impairments rendered him unable to work. In her notes dated January 4, 2011, Dr. Pattem reported that Dr. Hayden had recommended SSI for chronic depression and PTSD. In addition, she indicated on the same date that Santiago was diagnosed with hypertension, depression, right shoulder pain, back pain, and a history of hepatitis C. She further noted that "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work." (R. 316.)

If, as it appears, the ALJ mistakenly believed that the FEGS records were all reports by social workers, and not physicians, such a factual error "ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence

is significantly more favorable to the claimant than the evidence considered." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010). Because the FEGS reports are significantly more favorable to Santiago, remand is appropriate.

Upon remand, the ALJ must consider how to weigh the opinions of Dr. Hayden and Dr. Pattem under the regulations for evaluating opinion medical evidence. See 20 C.F.R. § 416.927. If necessary, the ALJ should contact these physicians to clarify the basis for their opinions, and if the ALJ concludes that the opinions are not supported by the objective medical evidence in the record, he must clearly explain this in his written decision.

> Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation, under *Schaal* and § [416.927(d)(2)], to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable.

Snell, 177 F.3d at 134.

The requirement to explain the evaluation of a physician's medical opinion applies to non-treating physicians[10] as well. See 20 C.F.R. § 416.927(c) ("we will evaluate *every* medical opinion we receive . . . [and] consider all of the following factors in deciding the weight we give to *any* medical opinion" emphasis added)); 20 C.F.R. 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, *the administrative law judge must explain in the decision the weight given* to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, *as the administrative law*

---

[10] "Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 416.902.

*judge must do for any opinions from* treating sources, *nontreating sources*, and other nonexamining sources *who do not work for us*.) (emphasis added).

Therefore, even if the ALJ determines that under the guidelines set forth in 20 C.F.R. § 416.927(c) these opinions should be given little weight, the ALJ must provide an explanation for his reasoning. See e.g., Colon v. Astrue, 10 Civ. 3779 (KAM), at *11 (E.D.N.Y. Aug. 10, 2011) ("[T]he ALJ failed to give good reasons for according the non-treating physicians substantial weight."); Featherly v. Astrue, 793 F. Supp. 2d 627, 631 (W.D.N.Y. June 23, 2011) ("[T]he ALJ must articulate her reasons for assigning the weight that she does accord to both the treating and nontreating physician's opinions.").

The Court cannot infer a reason for the ALJ's failure to address these records. See Barbera v. Barnhart, 151 F. App'x 31, 33 (2d Cir. Oct. 4, 2005) ("A reviewing court may not supply reasons to justify an agency determination." (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947))).

The Court is particularly concerned about the ALJ's silence on these favorable records given that the ALJ relied significantly on the less-favorable opinions of the state physicians, who, like the FEGS physicians, examined Santiago on only a single occasion. As such, the ALJ's decision to disregard the opinions of the FEGS physicians, without *any* explanation, is troubling. Given the ALJ's failure to provide an explanation for his reasoning, the Court cannot determine whether Santiago was afforded a full and fair hearing. 20 C.F.R. § 416.927(c)(2-6). The Court, therefore, recommends, that the case be remanded to identify the sources of the FEGS opinions and to provide a good reason for the weight given to these favorable opinions and records.

### 2.   Opinions from Treating Physicians During Relevant Period

It is also unclear from the record whether the ALJ affirmatively sought a mental or physical RFC assessment or other medical opinion from either Dr. Martin or Dr. Fruitman, both of whom were treating physicians during the relevant period. While the regulations impose a duty on the ALJ to request medical opinions from treating physicians in determining a claimant's RFC, see 20 C.F.R. § 416.913(b)(6), remand *solely* on this ground is unwarranted if there is substantial evidence in the record to support the ALJ's RFC determination. See Tankisi, 521 F. App'x at 34 ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC].").

Here, however, the Court is recommending remand for the proper consideration of Santiago's medical records under the treating physician rule. Therefore, the Court recommends that on remand the ALJ also seek medical opinions from Dr. Martin and Dr. Fruitman, the only physicians to have examined Santiago on multiple occasions during the relevant period. See Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) ("Because the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician . . . is his opportunity to develop an informed *opinion* as to the physical status of a patient." (citation and quotation marks omitted)). These opinions are of particular importance given the presence of mental impairments, the differing opinions regarding disability by the state physicians and the FEGS physicians, and, as will be addressed below, new evidence suggesting that Santiago's condition either was worse than thought at the time of the ALJ's decision or worsened after the relevant period.

35

### 3.   Additional Evidence

Santiago attached several medical records to his complaint, filed on June 6, 2013, which are not found in the administrative record, and on August 1, 2013, Santiago submitted additional documents to the Court, some of which also constitute new evidence. On March 31, 2014, the Court received a final document from Santiago and interpreted this to be Santiago's response to the Commissioner's motion. Though some of the key documents submitted to the Court postdate the relevant period, the date of the documents alone is not grounds for concluding that the evidence is not relevant because a medical report that postdates the period at issue may be "pertinent evidence in that it may disclose the severity and continuity of impairment existing before [the date in question]," Parker v. Harris, 626 F.2d 225, 232 (2d Cir. 1980).

Some of the newly submitted medical records support Santiago's assertions of physical and mental impairments, particularly with regard to his back pain, or at a minimum suggest that his physical impairments may have worsened following the ALJ's decision. For example, in October 2012, Daniel Paniagua, a physician's assistant at West Midtown Medical Group, noted that Santiago had chronic shoulder pain that increased with activity and resulted in a decreased range of motion. He also noted back pain with a decreased range of motion.

In January 2013, an All Med physical therapist indicated that Santiago's current health status was good, but that he was unable to bend over, lift, or walk more than a block and a half. His seated balance was good and his standing balance was fair, but Santiago's endurance and ambulation were poor. Furthermore, Santiago appeared for an appointment with a nurse practitioner at All Med in July 2013, using a rolling walker. By September 2013, Santiago reported that the pain in his lower back was a 9 out of 10 on average, and significantly interfered with his activities of daily living. Santiago was taking various medications and using a cream to

help control the pain. These medications provided only moderate relief and improvement in functionality.

In 2013, Dr. Sardar described Santiago's gait as slow, and noted that he had difficulty standing and walking without an assistive device. Dr. Sardar indicated that Santiago had a decreased range of motion in his lumbar spine, with significant spasm and tenderness to palpation. He described Santiago's impairments as severe.

On February 4, 2014, a New York City notification of a work requirements determination indicated that, as of that date, Santiago had been determined to be exempt from participating in temporary assistance work because of a medical issue. No basis for the determination was provided.

The Court concludes that upon remand, the Commissioner need not consider any of the duplicative documents or those that date predate the ALJ's decision. The duplicative documents are not "new" and have already been considered by the Commissioner. Furthermore, the records that predate April 27, 2012, could have been provided to the Commissioner prior to the ALJ's decision. Santiago has offered no explanation for his failure to do so. Accordingly, there is no "good cause" for the consideration of these documents.

As for the records that postdate the decision of the ALJ, remand for consideration is appropriate, particularly given the Court's recommendation for remand on other grounds. These documents are "new" because they have not been presented to the Commissioner, and there is good cause for Santiago's failure to present the evidence to the ALJ because they were created after the date of the ALJ's decision. See Pollard, 377 F.3d at 193 ("Because the new evidence submitted by [the claimant] did not exist at the time of the ALJ's hearing, there is no question that the evidence is "new" and that "good cause" existed for her failure to submit this evidence to

37

the ALJ."). Furthermore, because these records address many of the same impairments raised by Santiago, they may be "material" to Santiago's claims. These new records disclose a continuity of impairments and may shed light on the severity of the impairments prior to the ALJ's determination. See Melvin v. Barnhart, 02 Civ. 4527 (GBD)(JCF), 2004 WL 2591948, at *6-7 (S.D.N.Y. Nov. 8, 2004) (recommending remand where the new evidence of degenerative disc disease of the cervical spine "depart[ed] significantly from the previous evaluations" . . . and could be the "result of a worsening spinal condition."); Baran v. Bowen, 710 F. Supp. 53, 56 (S.D.N.Y. 1989) (remanding for consideration of new evidence where the evidence documented the severity of the claimant's impairments, was "closely linked" to the impairments during the period, and demonstrated that the impairments had worsened contrary to the ALJ's determination of improvement). Compare Mulrain, 431 F. App'x at 39-40 (refusing to remand where the new evidence did not indicate that the condition was more serious than originally thought or that the condition had worsened). The documents reveal that Santiago's physical impairments, particularly his back pain, have resulted in limited mobility that requires the use of an assistive device. His pain continues to be significant and his range of motion is limited. Dr. Sardar, an examining physician, described his impairments as severe. The Court cannot say that there is no "reasonable possibility" that this newly supplied evidence would not influence the Commissioner "to decide the claimant's application differently." Pollard, 377 F.3d at 193, 194.

Therefore, the Court recommends that on remand the Commissioner consider the new evidence that postdates the ALJ's decision to assess its effect on Santiago's disability determination during the relevant period.

**CONCLUSION**

The Commissioner failed to address all of the medical opinion evidence and failed to resolve ambiguities in the record as to the source of medical opinion statements, thereby leaving the Court unable to determine if the ALJ properly complied with the SSA regulations for evaluating medical opinions. Therefore, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED and the case be remanded to the Commissioner for further proceedings, including the consideration of the newly submitted evidence.

*                  *                  *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Swain. The failure to file these timely objections will

result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(b), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            July 14, 2014

cc:         George Santiago (*By Chambers*)
            2625 3rd Avenue
            Apt 4-D
            Bronx, NY 10451